**SPALDING & EVENFLO COMPANIES, INC., Plaintiffs,**

v.

**ACUSHNET COMPANY, Defendant.**

**Civ. A. No. 81–0088–H.**

United States District Court, D. Massachusetts.

July 5, 1989.

George P. McAndrews, John J. Held, Donald J. Pochopien and Robert C. Ryan, McAndrews, Held & Malloy, Ltd., Chicago, Ill., for plaintiffs.

Cynthia O. Hamilton, John J. Regan and Harold G. Hestnes, Hale & Dorr, Boston, Mass., for defendant.

## MEMORANDUM AND OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

HARRINGTON, District Judge.

This action is for patent infringement under federal law. Subject matter jurisdiction is present under 28 U.S.C. § 1338(a). Venue is proper in this district under 28 U.S.C. § 1400(b).

The plaintiff, Spalding & Evenflo Companies, Inc. ("Spalding") is a Delaware corporation having a place of business in Chicopee Falls, Massachusetts. Spalding is owner by assignment from the inventor Robert Molitor, an employee of Spalding, of U.S. Patent No. 3,819,768 ("Molitor patent" or " '768 patent") issued on June 25, 1974 and entitled "Golf Ball Cover Composition Comprising a Mixture of Ionic Resins." (Joint Trial Exhibit ("JTX") 444). Spalding is a manufacturer and seller of golf balls, golf equipment and other sporting equipment.

Defendant Acushnet Company ("Acushnet") is a Delaware corporation with a usual place of business in New Bedford, Massachusetts. Acushnet also manufactures and sells golf balls and golf equipment.

Spalding filed this action on January 15, 1981, alleging that Acushnet infringed claims 2 and 3 of Spalding's patent for the compositions of golf ball covers. An An-

swer was filed by the defendant, which included a counterclaim for a declaratory judgment of invalidity of claims 1 through 4 of the Molitor patent and non-infringement.[1] On November 28, 1986, Judge Nelson, to whom this matter was originally assigned, issued an Order of Preliminary Injunction enjoining the infringement of claim 3 of the patent in suit. On March 1, 1988, Judge Nelson transferred the case to this Court. By stipulation of the parties the issues of liability and damages were bifurcated.

The liability trial on this matter began on January 7, 1989, and concluded on February 13, 1989. The parties have filed post-trial briefs, and the matter is ready for decision. The Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. BACKGROUND

The subject of the suit is a patent for golf balls having covers that include a blend of sodium ionomer and zinc ionomer. Ionomers are commercially available under the trade name Suryln[R] ("Surlyn"), which is a registered trademark of E.I. duPont deNemours & Company ("DuPont"). The blended or mixed cover of zinc and sodium ionomers gives unexpected distance properties to golf balls when the claimed proportions are present.

The claimed invention of the '768 patent is described in claim 1 as follows:

1. A golf ball comprising a core and a cover, wherein said cover comprises from about 90 to about 10 percent of an ionic copolymer of an olefin having from 2 to 5 carbon atoms and a sodium salt of an unsaturated monocarboxylic acid containing from 3 to 8 carbon atoms and from about 10 to about 90 percent of an ionic copolymer of an olefin having from 2 to 5 carbon atoms and a zinc salt of an unsaturated monocarboxylic acid containing from 3 to 8 carbon atoms.

Claims 2, 3 and 4 of the '768 patent provide as follows:

2. The golf ball of Claim 1 wherein said cover comprises from about 75 to about 25 percent of an ethylene base sodium salt copolymer, and from about 25 to about 75 percent of an ethylene base zinc salt copolymer.

3. The golf ball of Claim 1 wherein said cover comprises from about 55 to about 45 percent of an ethylene base sodium salt copolymer and from about 45 to about 55 percent of an ethylene base zinc salt copolymer.

4. The golf ball of Claim 1 wherein said cover comprises about 50 percent of the sodium salt copolymer, and about 50 percent of the zinc salt copolymer.

The following issues were tried to the Court and shall be resolved in turn:

1. Whether the claimed invention of the patent-in-suit was used by others in the United States before the date of the alleged invention. *See* 35 U.S.C. § 102(a);[2]

2. Whether Spalding's claimed invention was described in a printed publication more than one year before the application date for the patent-in-suit. *See* 35 U.S.C. § 102(b);

3. Whether the Spalding invention was sold in the United States more than one year before the patent application date. *See* 35 U.S.C. § 102(b);

4. Whether the Spalding invention was obvious to a person having ordinary skill in the art. *See* 35 U.S.C. § 103.

5. Whether the applicant for the patent-in-suit misled the Patent Office with respect to a material reference. *See* 37 C.F.R. § 1.56.

---

1. Because claims 2, 3 and 4 of the Molitor patent are dependent upon claim 1, they incorporate claim 1. Therefore, it is necessary to construe claim 1 in order to rule on the validity of claims 2 and 3. Since Spalding has not alleged infringement of claim 4, the Court does not decide whether claim 4 is valid.

2. There is a claim of invalidity under § 102(g) that the invention was made in the United States by another before Spalding's alleged invention. Because the prior use and prior inventions in this case were all made by persons in this country, the analysis under § 102(g) is the same as the analysis under § 102(b).

6. Whether the patent-in-suit particularly points out and distinctly claims the subject matter which the applicant regarded as his invention. *See* 35 U.S.C. § 112.

7. Whether the specifications of the Spalding patent set forth the best mode contemplated by the inventor for carrying out his invention. *See* 35 U.S.C. § 112.

8. Whether Spalding's claims for damages attributable to sales of infringing golf balls are barred due to laches.

### 1. *Historical Background*

There are three categories of golf balls sold in the United States today: so-called one-piece, two-piece and three-piece balls. A one-piece ball is a single mass with paint on it. One-piece balls are used as range balls and are considered a second-rate ball. Up until 1966 all premium golf balls were of a three-piece construction. The three pieces were: a small center, a long elastic rubber thread wound around the center, and a cover of a thin resilient material. The center is typically a hollow sphere filled with a liquid or paste. The rubber threads are wound around the center at varying tensions. Golf ball manufacturers attempted for many years to perfect a two-piece ball which would eliminate the center core and rubber thread windings which were expensive to manufacture. A two-piece ball has a large solid core and a thin resilient cover just like the cover of the three-piece ball.

The cover material used on all golf balls through the mid–1960s was a natural substance extracted from tree sap, known as balata. Balls covered with this natural substance gave golfers a good click and a good feel when hit, and also such balls travel a satisfactory distance. Balata, however, was quite expensive and the ball was easily cut by the average golfer upon being mishit. Balata balls are still used by "low handicap" golfers.

In the mid–1960s a number of golf ball manufacturers began experimenting with Surlyn covered golf balls. Surlyn, a trademark name for a patented product invented by DuPont, are plastics called ionomers. Surlyn is less expensive and more durable and resistant to cutting than natural balata.

Dunlop Rubber Company, Ltd. ("Dunlop"), another golf ball manufacturer, acquired a patent on the use of Surlyn in a golf ball cover in 1966. *See* U.S. Patent No. 3,454,280 ("Harrison patent"). The Harrison patent was invalidated by *Dunlop Holdings, Ltd. v. Ram Golf Corp.*, 188 U.S.P.Q. 283 (N.D.Ill.1974), *aff'd*, 524 F.2d 33 (7th Cir.1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976), on the basis of prior use and invention by Metropolitan Golf Ball, Inc. ("Metropolitan").

In the late 1960s, when Spalding came into the market with its first Surlyn covered ball, not only Metropolitan and Dunlop but also Wilson Sporting Goods Co. and Ram Golf Corp. ("Ram") were experimenting with Surlyn covered golf balls.

In 1970 Spalding developed a successful two-piece ball under the trade name "Top Flite." Until Spalding's development of the Top Flite, no two-piece ball had seriously impacted the marketplace because the core of the two-piece ball gave a "hard feel" quite unlike the soft and elastic feel of the balata ball to which golfers had become accustomed. The Top Flite which Spalding initially put on the market had a cover made of a single sodium Surlyn 1555.

The single sodium Surlyn cover of the two-piece Top Flite ball was found to crack when exposed to or hit in cold weather. In the fall of 1970, Mr. Molitor, then Vice President of Research and Development for Spalding, contacted Roy Kinsey ("Kinsey") of DuPont for help in correcting the cold-cracking problem with Spalding's Surlyn covered golf balls. Kinsey advised Mr. Molitor to use a zinc Surlyn 1557. There is a factual dispute as to what Kinsey advised concerning the blending of sodium and zinc Surlyns.

Mr. Molitor then ordered his assistant, Emil Marciniak, to try a 50/50 blend of sodium and zinc Surlyns and to monitor the test results. On December 28, 1970, Mr. Paul St. Cyr, a chemical compounding technician at Spalding, conducted the test.

(JTX 378, p. 58). On February 16, 1971, Spalding solved the cold-cracking problem (JTX 378) and went into production on February 17, 1971 with the Top Flite blended sodium and zinc Surlyn cover. The ball was an immediate commercial success.

On February 11, 1972, Spalding, as assignee of Mr. Molitor, applied to the Patent and Trademark Office ("PTO" or "Patent Office") for a patent on a golf ball having a cover that included a blend of sodium Surlyn and zinc Surlyn. The application for the patent was twice denied by the Patent Examiner, until Mr. Molitor advanced the position that the blended sodium and zinc Surlyns resulted in an additional property; that, not only did the blending of the zinc and sodium Surlyns in a wide range of proportions produce a desired durability and cold-cracking resistance, Molitor explained, but it also increased the distance the ball would travel, referred to as coefficient of restitution,[3] over what would otherwise be predicted. Based on the increase in coefficient of restitution of the blend of zinc and sodium Surlyns over the weighted average of the coefficient of restitution of the individual Surlyns, the patent issued on June 25, 1974. As the term of a patent is seventeen years, the Molitor patent expires in 1991.

In March of 1973, while the Molitor patent was still being prosecuted in the Patent Office, Acushnet introduced the DT Titleist, a golf ball having a blend of zinc and sodium Surlyns. (JTX 348). On April 13, 1976, Spalding sent a letter to Acushnet complaining that Acushnet was either infringing on the Molitor patent or was engaging in false advertising. (JTX 219). Acushnet then ordered its technical personnel to develop a non-infringing golf ball. Acushnet ceased infringing the Molitor patent by October of 1977. In late 1980, Acushnet introduced the Pinnacle two-piece ball. The Pinnacle had a different formula of blended zinc and sodium Surlyns in the cover composition than did the DT Titleist, which had infringed the Molitor patent between June 25, 1974 and October of 1977. Acushnet continued to produce a blended sodium and zinc Surlyn cover until Judge Nelson, on November 28, 1986, enjoined Acushnet from further manufacture and sale of golf balls having a blended cover of zinc and sodium Surlyns in the proportions set out in claim 3 of the Molitor patent.

### 2. Technical Background

Surlyn is a trademark for part of a class of plastics which are referred to as resins, ionic copolymers or ionomers. An ionomer or ionic copolymer is a compound made up of molecules in the form of long chains, where the chains are joined to each other in certain locations along their length by ionic bonding.

A polymer is a chain of molecular units called monomers.[4] A copolymer is a polymer made of at least two different types of monomers. An ionic copolymer, or ionomer, has three constituents: an olefin[5] derived monomer; an unsaturated derived monocarboxylic acid;[6] and an ionic metal

---

3. Coefficient of restitution is a measurement of the percentage speed, relative to initial velocity, with which a ball rebounds from a fixed metal plate or other barrier. The measurement obtained is the speed of the rebound expressed in a percentage of the original speed of the ball. Spalding contends that coefficient of restitution of .785 corresponds to the United States Golf Association maximum initial velocity of 255 feet per second.

4. The ionic copolymer in claim 1 of the '768 patent has a monomer unit derived from an olefin. An olefin is a molecule consisting of carbon and hydrogen where there are twice as many hydrogen (H) atoms as carbon (C) atoms.

5. The olefin disclosed in this patent is in the form of an ethylene gas.

6. An acid is a molecule that can give up a hydrogen atom (H) in a chemical reaction. A carboxylic acid group (COOH) is made up of a carbon (C), an oxygen (O), and an oxygen bonded with a hydrogen atom (OH). A monocarboxylic acid is a compound containing only one carboxylic acid group. The H attached to the O of the OH molecule may be given up in a chemical reaction, giving the molecule its acid nature. An unsaturated monocarboxylic acid contains two carbon atoms bonded by double bonds. The term "unsaturated" denotes a structure with a double bond.

salt of the monocarboxylic acid.[7] When a metal salt of an acid forms, the acid is said to be neutralized.

Due to the charged nature of metal ions attached to monocarboxylic acid, these metal ions will associate with additional monocarboxylic acid locations on the copolymer chains and then will also bond to other locations. These associations are known as cross-linking. The degree to which the metal ions will bond to other locations on the chain depends on a number of factors, including the degree of neutralization of the acid on the chains, the types of metal ions present, the specific molecules that make up the olefin and the monocarboxylic acids, the length of the chains, and such conditions of polymerization as temperature, pressure and time.

In simpler terms, if one takes a chain of molecular units called a monomer and brings it together with a monocarboxylic acid, one gets a substance which is an acid copolymer. Then, if one adds sodium or zinc ions, the acid is neutralized. The resultant properties of the ionomer (the Surlyn) are determined by the amount and combination of metal ions used to neutralize the acid.

## II. VALIDITY

When a patent is issued a presumption of validity attaches to it. 35 U.S.C. § 282.[8] This statutory presumption exists for two reasons: (1) grant of a patent is an administrative decision supported by Congress, and (2) the Patent and Trademark Office ("PTO") has expertise in determining whether the conditions of patentability have been met, and its determination is entitled to deference. The presumption of validity becomes important when an alleged infringer of a patent argues that the patent-in-suit is invalid because the is-

suance of the patent to the plaintiff by the PTO was erroneous. Section 282 of the Patent Act mandates that the party asserting invalidity carry the burden of proof to establish such error.

The Patent Act, and thus the statutory presumption of validity, is derived from Article I of the United States Constitution which grants Congress the power "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Art. I, § 8, cl. 8. The framers of the Constitution intended to promote the advancement of science and technology by rewarding the creativity and ability of inventors with a grant of a limited monopoly in exchange for the public disclosure of their inventions.

The presumption of validity is rebuttable. Courts have interpreted Section 282 as requiring that the patent challenger prove patent invalidity by clear and convincing evidence. *See Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1567 (Fed.Cir.1983); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.1983). This heavy burden of proof is deeply rooted in the nature of the judicial process, for it reflects the deference owed to the considered judgment of an expert, such as a Patent Examiner, skilled in areas of complex and specialized technology. Therefore, with respect to Acushnet's counterclaim attacking the validity of the Spalding Patent, Acushnet must convince the trier of fact by clear and convincing evidence that the patent is invalid. This burden remains with Acushnet throughout the trial, *see e.g., American Hoist & Derrick Co. v. Sowa & Sons*, 725

---

7. An ionic metal salt of a monocarboxylic acid is a monocarboxylic acid that has reacted with an electrically charged metal atom such as sodium (Na+) or zinc (Zn++), known as ions.

8. The relevant portion of 35 U.S.C. § 282 provides:
 A patent shall be presumed valid. Each claim of a patent (whether in independent or de-

pendent form) shall be presumed valid independently of the validity of other claims; dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it.

F.2d 1350, 1360 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984), and is made more difficult when, as in the case at bar, the prior art relied upon at trial is the same as that which was before the PTO. *See Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve,* 796 F.2d 443, 447 (Fed.Cir.1986), *cert. denied,* 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987).

## A. ANTICIPATION

Acushnet advances three grounds in support of its argument that the Molitor patent is anticipated under 35 U.S.C. § 102. First, Acushnet contends that the invention of the Molitor patent was placed on sale more than one year prior to the date of the patent application and is, therefore, invalid under § 102(b). Acushnet also contends that the Molitor patent was anticipated by prior art under § 102(b) because it was described in the Harrison patent, a printed publication, more than one year prior to the date of the patent application. Finally, Acushnet contends that three golf ball manufacturers used sodium and zinc ionomers in golf ball covers before Molitor's alleged invention and, therefore, the Molitor patent is invalid under § 102(a).

### 1. *Prior Sale*

■ Acushnet argues that golf balls having covers containing both zinc and sodium ionomers were produced and sold by others in the United States before Mr. Molitor's alleged invention on December 28, 1970, or in the alternative, before February 11, 1971, the one-year statutory bar date under § 102(b). Particularly, Acushnet contends and seeks to prove by clear and convincing evidence, Metropolitan used sodium and zinc ionomers in golf balls during the period from 1965 through 1970, as did Ram between August, 1969 and September, 1970, and as did Swift in 1968 and 1969.

The essence of a patentable invention is that it is something new. Congress therefore requires novelty as a prerequisite for patentability. *See* 35 U.S.C. §§ 101, 102. If the alleged invention is already in the public domain, the public would obtain no *quid pro quo* for the grant of monopoly conferred by the patent. Indeed, the public would be deprived of matter to which it had already had free access.

Because of the myriad of circumstances surrounding the development of new ideas, Congress has enacted statutory requirements that define when an idea will be considered patentably new, and what kind of diligence is required in the prosecution of a patent. *See* 35 U.S.C. §§ 102(a)-(g). The provisions most relevant to the issue of prior use are 35 U.S.C. § 102(a), (b) and (g).[9]

35 U.S.C. § 102(a) and (g) provide that an invention is patentable unless, before the alleged date of invention of the patent at issue (in this case, December 28, 1970): (1) "the invention was known or used by others in this country ..."; or (2) "the invention was made in this country by another who had not abandoned, suppressed, or concealed it," 35 U.S.C. § 102(g). These provisions ensure that only the first inventor will receive a monopoly. If he decides not to seek a patent, the information belongs to the public.

■ With respect to § 102(a), "prior knowledge and use by a single person is sufficient" to preclude patentability. *Coffin v. Ogden,* 85 U.S. 120, 124, 21 L.Ed. 821

**9.** 35 U.S.C. §§ 102(a), (b) and (g) state:
A person shall be entitled to a patent unless—
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

* * * * * *

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

(1874); *see also Corona Cord Tire v. Dovan Chemical,* 276 U.S. 358, 382–384, 48 S.Ct. 380, 387–388, 72 L.Ed. 610 (1928); *Brush v. Condit,* 132 U.S. 39, 48, 10 S.Ct. 1, 4, 33 L.Ed. 251 (1889). Section 102(g) precludes patentability if the anticipating work has been reduced to practice and not abandoned, suppressed or concealed. *E.I. DuPont deNemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1437 (Fed.Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988); *Dunlop Holdings Ltd. v. Ram Golf Corp.,* 524 F.2d at 36–37 (holding that the anticipating use does not have to disclose the nature of the invention in order to invalidate the patent).

■ 35 U.S.C. § 102(b) provides that an invention is not patentable if it was "in public use or on sale in this country, more than one year prior to the date of the application for patent." 35 U.S.C. § 102(b). The purpose of Section 102(b) is to force an inventor, even if he is the first inventor, to proceed diligently to the Patent Office after a commercial or public use of the invention. *In re Foster, supra,* 343 F.2d at 987–988.

### (a) Metropolitan Golf Balls

Metropolitan, a small company in California, was the first golf ball manufacturer to make and sell Surlyn covered golf balls. *Dunlop Holdings, Ltd. v. Ram Golf Corp.,* 188 U.S.P.Q. at 386–88 (invalidating Dunlop's Harrison patent due to Metropolitan's prior use). Metropolitan was producing golf balls from 1965 through as late as 1973. Metropolitan's President, Robert Wagner, testified in the instant case by deposition that Metropolitan blended different kinds of Surlyn for golf ball covers prior to 1970.

The following nine golf balls allegedly originating with Metropolitan were introduced in evidence as prior art:
* Hays (DTX 158–160)
* Hilton Insignia (DTX 150–153)
* Avnet Transitron (DTX 154–157)
* Beverly Hilton (DTX 144–146)
* Westinghouse (DTX 147–149)

Daco (DTX 141–143)
* Ray Valind (DTX 164–166)
* Carlson's (DTX 167–169)
Byron Nelson (DTX 171–173)

All except the Daco and the Byron Nelson were submitted as anticipating prior art.[10] The covers of each golf ball were tested by an independent laboratory, Springborn, in a proceeding monitored by Spalding's trial expert. Acushnet contends that Springborn's atomic absorption tests demonstrated the presence of both zinc and sodium in all of the covers except the Daco ball. Acushnet further contends that Springborn's infrared spectroscopy tests confirmed that zinc and sodium were present in the carboxylate, or salt of the acid form, and, if Springborn's infrared spectra is accepted by the Court, all the golf balls contained the appropriate olefin and acid. Spalding contests the accuracy of Springborn's infrared spectra and atomic absorption tests and contends that Acushnet has failed to prove by clear and convincing evidence that any of the Metropolitan balls has the limitations to the relative amounts (percentages) of the sodium and zinc ionic copolymers in its golf ball covers as set forth in the claims of the Molitor patent. Acushnet contends that variations as to the relative amount of ionic copolymers in the cover imposes no boundaries under the Molitor patent on the amounts or sources of zinc, sodium, olefin or acid in the cover.

The alleged Metropolitan balls were admitted in evidence in two sets; each set will be individually addressed. The first set consists of the last three balls designated in the list above: the Byron Nelson, the Carlson's and the Ray Valind. The second set consists of the first six balls designated in the list above. For the reasons set forth below, the Court rules that the defendant has not proved by clear and convincing evidence that any of the golf balls admitted in evidence were Metropolitan golf balls in use prior to February 11, 1971, nor that they were in existence prior to December 28, 1970. Therefore, the Court does not discuss the infrared spectra and atomic absorption tests or interpret the construction

**10.** Acushnet concedes that the Daco and Byron Nelson are non-anticipating.

of claims 1–4 for the purpose of determining whether the alleged Metropolitan balls invalidate the Molitor patent under § 102.

### (1) *The First Set*

■ The first set of the alleged Metropolitan balls (the Ray Valind, the Carlson's and the Byron Nelson) was presented by Metropolitan's President Wagner to Barbara Moore of Acushnet. Mr. Wagner did not testify at trial. His deposition was taken on November 23, 1981, and was admitted in evidence during the trial of this matter. Acushnet offers Wagner's testimony to establish that the first set of alleged Metropolitan balls admitted in evidence were Metropolitan balls manufactured before February 11, 1971. Although unsupported oral testimony can be sufficient to establish prior use, it must be regarded with suspicion and subjected to close scrutiny. *E.I. duPont DeNemours v. Berkley & Co., Inc.*, 620 F.2d 1247, 1261 (8th Cir.1980).

I do not find Wagner's testimony credible as to the date the first set of Metropolitan balls was manufactured. Mr. Wagner was initially unable to recall the date the Byron Nelson ball or the Carlson's or Ray Valind balls were manufactured. His memory had to be refreshed by a note he had made within two months of the deposition question and prepared in contemplation of this litigation.[11] In particular, the questioning went as follows:

Q. Does Byron Nelson associate with a year, in your mind?

A. Not any particular year.

Q. I show you this hand note [DX 163] and ask you if you can identify this, sir, this handwritten note.

A. Yes. It's my writing.

Q. Does that refresh your recollection as to the bracket of time within which the golf balls you presented to Ms. Moore were manufactured?

A. Yes.

Q. And what are the years given?

A. Between 1965 and 1970.

Q. I show you now two envelopes which contain, as far as cover is concerned, three quarters of a golf ball each with pictures, and I ask you as to whether those are golf balls which you provided Ms. Moore on a previous occasion.

A. Yes. That's true.

Q. And looking at the one which you now have in your hand, does that bear any identifying marks?

A. It has the name Ray Valind.

Q. Mr. Wagner, can you identify Ray Valind for us?

A. He was a personal friend he [sic. I] had been acquainted with for many years.

Q. And did you make that golf ball for him?

A. Yes, we did.

Q. And is that also a ball which was manufactured sometime between 1965 and 1970?

A. Yes, it is.

[Wagner T.T., Vol. X, p. 37, ln. 12 to p. 38, ln. 5.]

Q. Mr. Wagner, I show you three pictures of a ball and you have seen the ball in question, have you not?

A. That is true.

Q. And is that a ball manufactured by Metropolitan personalized with the name Carlsons?

A. That's true.

Q. Was that similarly manufactured by Metropolitan during the same time frame, that is 1965 to 1970?

A. Yes, it was.

[Wagner T.T., Vol. X, p. 38, ln. 12–24.]

Although there is nothing impermissible in the manner in which Wagner's memory was refreshed, *see* Fed.R.Evid. 612, the trier of fact may consider its effect on the testimony's accuracy and credibility.

The following testimony on cross-examination corroborates that the note was made

---

11. I am convinced that the note used to refresh Mr. Wagner's memory as to the date of manufacture of the Byron Nelson ball was also used to refresh his recollection as to the time frame in which the Carlson's and Ray Valind ball were manufactured.

after Wagner had been contacted by Acushnet's counsel:

Q. ... Then subsequently you testified after being shown a note, do we have that? Exhibit 9.

MR. McANDREWS: Do you know what exhibit it is?

MR. REGAN: Not off the top.

MR. POCHOPIEN: Defendant's Exhibit 163.

Q. I believe that you then believe that it was actually made between 1965 and 1970, do you recall that testimony?

A. Yes.

Q. Having had your recollection refreshed by this note, could you tell us the circumstances under which this note came into being?

A. I'm not exactly sure where it came from. Obviously, I wrote it and it's from my desk pad. I believe I gave it to Barbara or sent it to Barbara along with some golf balls.

Q. Do you remember when you wrote it approximately?

A. A month ago, six weeks ago.

MR. McANDREWS: And the date of the deposition is November 23, 1981.

Q. Somewhere in the last two months?

A. Oh, yes.

[Wagner T.T., Vol. XIV, p. 14, ln. 7 to p. 15, ln. 9.]

There is nothing impermissible about the manner in which the note was used to refresh Mr. Wagner's recollection. The note, however, was prepared about six weeks prior to the taking of Wagner's deposition, concerning events which occurred more than ten years previous thereto and had to be used to refresh his recollection very shortly after he wrote it. This detracts immeasurably from the witness' credibility. The note, moreover, had first been written after contact with counsel involved in this litigation. While this is not improper, it does lessen the weight which I, as the trier of fact, ascribe to Wagner's testimony as to the dates of manufacture of the first set of Metropolitan balls.

Not only was Wagner's recollection in need of refreshing, but his examination was excessively leading:

Q. Over what period did you manufacture those balls for Northwestern?

A. You're speaking of the ones with surlyn covers?

Q. Yes.

A. From 1965, '66, '67, '68, '69 and some after '70, '71, '72 possibly.

Q. How about 1973?

A. It's possible.

Q. Do you know whether or not during that period the surlyn balls were made with a Byron Nelson stamp on them?

A. I'm sorry?

Q. Do you know whether during that entire period Northwestern balls were made by Metropolitan with a Byron Nelson stamp on them?

A. Yes, that's possible.

[Wagner T.T., Vol. XIV, p. 11, ln. 12 to p. 12, ln. 4.]

In sum, then, the Court was presented with a witness who did not appear at trial. While his testimony remains relevant and admissible under Fed.R.Evid. 804(b)(5), the Court was nonetheless unable to examine his demeanor on the witness stand. Moreover, the direct examination of Wagner was leading and was influenced by a note prepared in contemplation of this litigation. Therefore, I find that Acushnet has not proved by clear and convincing evidence that the Ray Valind and Carlson's balls were manufactured prior to February 11, 1971.

### (2) *Second Set*

The six golf balls constituting the second set of alleged Metropolitan balls were selected from a display case that was removed from Metropolitan's office and put in storage in 1969. Wagner admitted that he did not know whether anybody had added to, subtracted from, or changed any of the balls during the period of 1969 until 1981. [Wagner T.T., Vol. XIV, p. 16, ln. 5-9]. Metropolitan was making golf balls in 1971, 1972 and 1973. Golf balls are fungible products. It is possible that the

second set of Metropolitan balls was made between February 11, 1971 and 1981. Therefore, Acushnet has not proved by clear and convincing evidence that the second set of alleged Metropolitan golf balls were made before February 11, 1971.

### (b) Swift Golf Balls

In the late 1960s Swift was a manufacturer of range golf balls. Between 1967 and 1969 Harry LaTowsky ("LaTowsky") worked for Dupont, selling Surlyn to the golf ball industry in the Northeastern part of the United States. Mr. LaTowsky testified that he received two or three dozen golf balls from Mr. Robert Berman ("Berman") of Swift with no restriction of confidentiality or use, and that he played with several of these balls on golf courses in New Jersey. LaTowsky testified that he recommended to Mr. Berman that he blend zinc and sodium Surlyns to inhibit cold-cracking of the golf ball covers, and that the Swift balls in evidence were examples of that work.

Twelve golf balls allegedly originated with Swift, of which ten were tested for their cover content. In particular, LaTowsky balls 1–6 (DX 116–121 (covers), and (DX 126–131) (cores)) and HL [12] –1, –2, –3 and –4 (DX 122–125) were tested for their cover content. The remaining two balls allegedly originating with Swift (DX 133, 134) were allegedly sent to Acushnet's counsel. Acushnet contends that its atomic absorption and infrared spectroscopy tests on LaTowsky balls 1–6 and its spectroscopy tests on HL 1–4 shows the presence of zinc and sodium carboxylic acid salts in LaTowsky balls 1–5, and in HL–1, HL–2 and HL–4; Acushnet also claims that these tests show that the balls contained olefin and acid so as to make them fall within claims 1–4 of the Spalding patent. No tests were run on the two balls allegedly sent to Acushnet's counsel (DX 133 and 134), and for this reason the Court finds that they have not been shown to anticipate the Molitor patent. For the reasons stated below, the Court rules that Acushnet has failed to prove by clear and convincing evidence that the alleged Swift balls designated LaTowsky 1–6 and HL 1–4 anticipate the Molitor patent.

The alleged Swift balls designated HL 1–4 were subjected to infrared spectroscopy tests but were not subjected to atomic absorption tests. The Court finds credible the testimony of Spalding's expert Dr. William Risen that one cannot rely on infrared spectroscopy tests alone to demonstrate the presence of sodium and zinc in the cover composition. (Risen T.T., Vol. XX, p. 59–61). Even Acushnet's expert Dr. Stewart Cooper testified as to the importance of having an atomic absorption analysis:

> However, I think a more definitive analysis of something like a golf ball cover should rely on more than just the infrared signature. I would like to see, for example this coupled to atomic absorption data that would look for the various cations that could be in the system.

(Cooper T.T., Vol. XVII, p. 205, ln. 11–16). Therefore, the Court finds that Acushnet has not met its burden of proving by clear and convincing evidence that HL 1–4 anticipate any of the claims of the Molitor patent.

The Court finds credible Mr. LaTowsky's testimony that he received golf balls from Swift during late 1967 or early 1968. Mr. LaTowsky testified that in 1986 he sent five of the alleged Swift golf balls to Duncon Pollitt ("Pollitt") of the Yardly Golf Ball Company and that he sent four of the alleged Swift golf balls to James Hansberger ("Hansberger") of Ram. Mr. Pollitt and Mr. Hansberger had contacted LaTowsky in connection with ongoing litigation between Spalding and Ram. Mr. Pollitt was working as a consultant with Ram to investigate prior use of zinc and sodium in golf ball covers.

I find that Acushnet has not proved by clear and convincing evidence that the balls Mr. LaTowsky received from Swift in 1967 or 1968 are the same balls he sent to Mr. Pollitt, Mr. Hansberger and Acushnet's

12. The HL is an identifying designation put on by Acushnet for Harry LaTowsky as the source of the balls.

counsel some eighteen years later. Some of the golf balls were kept in a *number* of old golf bags and some were kept in a large container. Mr. LaTowsky testified that he, his wife and children had access to the family's golf bags and golf balls and that the Swift balls were played. Moreover, as the following trial testimony demonstrates, it is likely that some of the Swift balls may have been lost through the years;

Q. It was also not unusual for you to grab any golf balls that were available and play them when you or your wife were going to play golf; isn't that correct?

A. Actually, these golf balls, since they're not identified, they're not pointed, I would not have used these golf balls in any tournament play or any perhaps social play where I wanted to score well.

Q. But you did use them?

A. I used them back in the earlier days when I was first involved in the golf ball development program.

Q. What do you mean by "earlier days?"

A. Back when I was given the golf balls in the late '60s. And I put them aside, and I have a number of golf balls that I use just for you might say hitting across long water holes or things like that, and I figure I might lose them that way and might as well keep them for that application anyway.

Q. And your wife had access to these golf balls, didn't she?

A. Yes, but I don't think she would have used them.

Q. When you play golf, are you like most, you lose one and you'll pick up a golf ball along the way?

A. Yes.

Q. And you returned to your home and you found five balls in a miscellaneous golf bag of old ones, did you not?

A. Yes.

Q. What's a miscellaneous bag?

A. At that time I think we had two old ones and two newer bags, and as I say, we had a collection of old irons and old woods that my father had retired from the game and had given me some of his old clubs, and I have four children, a couple of them who play golf, so we generally don't throw things out of that nature. We figure somebody will be able to use them at one time or another.

Q. Which one of the miscellaneous bags did you find the golf balls in?

A. I don't recall.

Q. Was it one that one of your children used?

A. I don't recall.

In addition, although as a matter of law the alleged Swift balls were authenticated and admitted in evidence without objection, I am unconvinced as the trier of fact that the chain of custody proven by Acushnet constitutes clear and convincing evidence that the balls sent by Mr. LaTowsky to Mr. Pollitt, Mr. Hansberger and Acushnet's counsel are the same balls admitted in evidence at trial;

Q. Now, I'm going to show you what have been marked for identification—

MR. REGAN: And which I will not offer at this time, your Honor, a series of plastic bags which—two sets, one series runs from Defendant's Exhibit 116 through and including Defendant's Exhibit 121, and I'll represent to the Court that what are in those bags are pieces of the cover of some balls that have been marked as Latowsky 1 through 6 balls, and also a second series have to do with centers of balls, two-piece centers, which run from Defendant's Exhibit 126 through 131.

Q. Now, are you able in the form in which they're in front of you, Mr. Latowsky, to identify those balls as the ones that you gave to either Mr. Pollitt or Mr. Hansberger?

A. As seen here, I would find it hard to identify them.

[LaTowsky T.T., Vol. VIII, p. 61, ln. 5–22]. Accordingly, LaTowsky could not identify

the balls designated LaTowsky 1–6 as the balls he gave to either Mr. Pollitt or Mr. Hansberger, competitors of Spalding. Consequently, these balls and the evidence associated with them are given no weight.

In addition to the lack of specific identification of the balls designated "LaTowsky 1–6," Mr. LaTowsky's correspondence indicates that he had problems identifying the origin of the balls that he later testified originated with Swift. In particular, Mr. LaTowsky's correspondence, which preceded his trial testimony by two and one-half years, indicates that as of July 3, 1986, he did not know whether he had received the alleged "Swift" golf balls from one or more of four designated companies:

> ... I was able to locate five such golf balls that would have been given to me by one or more of the golf ball companies that I was working with during the 1967–69 period including Swift, Acushnet, Uniroyal and Plymouth.

(PX 38). Eleven months later, and after having spoken with Acushnet's counsel, LaTowsky still was unsure who produced the balls that he sent to Acushnet's trial counsel and he speculated as to their origin:

> There is no identification as to which firm produced these. It might have been Swift though.

(PX 44, ¶ 3).

Accordingly, based on my observations of LaTowsky's demeanor and the incredibility of much of his testimony as well as the expert testimony of Risen and Cooper, the Court rules that the alleged Swift golf balls do not anticipate the Molitor patent.

### (c) The Ram Balls

Acushnet advances two propositions to support its contention that Ram manufactured golf balls prior to 1970 which were within Claims 1 through 4 of the Molitor patent: (1) the lab notebook pages of Ram (DTX 3) to support the testimony of Mr. Terry Pocklington ("Pocklington") and Mr. Hansberger that Ram blended sodium and zinc Surlyns; and (2) evidence that Ram produced an all zinc Surlyn (8104) golf ball cover which contained under four percent (4%) by weight of the pigment SU–53, which Ram contends contained four parts sodium Surlyn 1559.

I find that Mr. Pocklington, an employee of Spalding's competitor Ram, has an interest in the outcome of this suit. This interest is demonstrated by Ram's entering into a "Final Judgment on Consent," wherein it admitted infringement of the Molitor patent and was enjoined from further infringement.

DTX 3, the lab notebook pages of Ram, does not support Mr. Pocklington's conclusory answers to leading questions (T.T., VII, pgs. 124, 209) indicating that Ram blended sodium and zinc Surlyns during the 1967–1970 period. The lab notebook suggests that Ram's blending was entirely of sodium Surlyns. Mr. Pocklington did not know which Surlyns he blended (T.T., VII, pgs. 124–126, 202) nor did he know whether he sold any balls which contained zinc and sodium Surlyn blended covers. (T.T., VII, pg. 125).

I find by clear and convincing evidence that during the period 1967–1970 Ram manufactured and sold golf balls covered with sodium Surlyn, type 8044, in 1967; balls covered with sodium Surlyn, type 8077 (now designated 1559), in 1968; and balls with a blended cover consisting of 96 parts zinc Surlyn (8104), four parts sodium Surlyn (1559) and two parts titanium dioxide, in early 1970. This blend of zinc and sodium Surlyns is the only such blend established by clear and convincing evidence. This last composition is an all-zinc Surlyn (8104) golf ball cover having SU–53 added as a pigment. The SU–53 contained the four parts sodium Surlyn. Because Ram's 1970 golf ball has *only* four parts sodium Surlyn in a pigment blended with 96 parts zinc Surlyn, it does not incorporate the express limitations of the Spalding patent regarding the relative amounts of the ionic copolymer.

Mr. Hansburger, the President of Ram, testified by deposition. His testimony added nothing to the testimony of Mr. Pocklington. He said that he "believed" that Ram had blended zinc and sodium Surlyns in 1966 and 1967 and that there would be some indication of that fact in DTX 3.

(Vol. IX, pgs. 158–159). But Mr. Hansburger conceded that DTX 3 did not reflect that there had been any blend of zinc and sodium Surlyns (Vol. IX, pgs. 162–163, 166), and that the only blend of zinc and sodium Surlyns that he specifically knew of was the 96 part zinc Surlyn, four part sodium Surlyn and two part titanium dioxide contained on the cover of the 1970 ball discussed above. (Vol. IX., pgs. 163–164; Vol. X, pgs. 17–21).

Therefore, I find that Ram golf balls manufactured prior to February 11, 1971 did not anticipate the Molitor patent.

### 2. On–Sale Bar

 Acushnet contends that Spalding placed the Molitor invention "on sale" more than one year prior to February 11, 1972, the filing date of the Molitor patent application. A single sale *or offer to sell* more than one year before the patent application will bar a patent. *In re Caveney*, 761 F.2d 671 (Fed.Cir.1985). This statutory bar is absolute and operates even if the sale was only one day before the one-year grace period for filing the patent application. *See Buildex, Inc. v. Kason Industries, Inc.*, 849 F.2d 1461, 1465 (Fed.Cir.1988). To determine if an invention has been "on sale" for the purposes of the statutory bar, *see* 35 U.S.C. § 102(b), a defendant "has the burden of proving that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to prior art." *UMC Electronics Co. v. United States*, 816 F.2d 647, 656 (Fed.Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). If Acushnet can make a prima facie showing that the invention was "on sale" before the statutory bar date, then Spalding must "come forward with an explanation of the circumstances surrounding what would otherwise appear to be commercialization outside the grace period." *Id.* The Court applies the following three-part test to determine if an invention has been "on sale" for purposes of the § 102(b) bar: (1) the complete invention claimed must have been embodied in or obvious in view of the item offered for sale; (2) the invention must have been sufficiently tested to verify that it is operable and commercially marketable; and (3) the sale must have been primarily for profit rather than for experimental purposes. R. Harmond, *Patents and the Federal Circuit*, § 3.4(c) (1988); *Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd.*, 731 F.2d 831, 837–38 (Fed.Cir.1984).

One circumstance which has been found to constitute an offer to sell is the sending of a prototype or sample to a customer to elicit a sale. *In re Caveney*, 761 F.2d at 675. Acushnet alleges that Spalding offered for sale a blended zinc/sodium Surlyn covered golf balls at the January, 1971 PGA show in Florida. The evidence, however, is uncontradicted that Spalding did not send blended Surlyn covered balls to the PGA trade show in January of 1971. Nonetheless, if Spalding took offers for sale from even one customer for either immediate or future delivery of a golf ball which had a cover that was composed of matter that brought the ball within the scope of claims 1–4 of the Spalding patent, the patent is invalid.

Acushnet contends that the totality of circumstances surrounding the taking of orders for the Top Flite constitutes clear and convincing evidence of an offer to sell golf balls with a zinc/sodium blended cover. *See King Instrument Corp. v. Otari Corp.*, 767 F.2d 853 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). Acushnet alleges that when Spalding took orders from customers at the January, 1971 PGA show, those orders must have been for blended Surlyn covered golf balls. In November of 1970, a "panic situation" existed at Spalding as complaints from customers and Spalding sales people concerning the cold-cracking problem escalated. Spalding moved as quickly as possible to solve the cold-cracking problem. On December 24, 1970, Spalding's top management decided to quarantine all current inventory of the all-sodium Surlyn Top Flite balls, halt production, and begin a major testing program to

solve the cold-cracking problem immediately. (JTX 336, 431). Spalding realized that most northern customers who placed orders at the January, 1971 PGA show expected delivery by April of 1971. The factual issue to be resolved is whether Spalding went to the PGA show in January of 1971 with the intention to offer for sale and delivery a golf ball with a blended sodium/zinc Surlyn cover. The issue is not whether Spalding went to the show intending to offer for sale and delivery the all sodium Top Flite ball.

■ Full-scale production of the blended cover ball commenced on February 17, 1971. (JTX 338 and 346). Perhaps if Spalding had been unable to reduce to practice a blended Surlyn golf ball in time for April delivery to Northern pro shops it might have released from quarantine its all sodium Surlyn balls. The Court, however, need not determine what Spalding would have done if it had been unable to resolve the cold-cracking problem. It is not a violation of 35 U.S.C. § 102(b) to sell golf balls for future delivery without knowing what the cover composition of those golf balls will ultimately be. The Spalding lab notebook (JTX 378) indicates that the cold-cracking problem was solved on February 16, 1971. (JTX 378 at Notebook p. 60; Molitor T.T., Vol. 3, p. 15; St. Cyr T.T., Vol. X, p. 87). Therefore, I find that Acushnet has not proved by clear and convincing

evidence that Spalding placed the Molitor invention "on sale" at the PGA show in January, 1971 or any time prior to the statutory bar date of February 11, 1971. Prior to February 11, 1971, Spalding was selling whatever would be the best quality golf ball it would be able to produce by April of 1971.[13]

### 3. *The Harrison Patent*

■ Acushnet contends that the Harrison patent issued to Dunlop on July 8, 1969, anticipates the Molitor patent because the alleged Molitor invention was described in Harrison, a printed publication, either (1) prior to the claimed date of invention of the patent-in-suit, § 102(a), or (2) one year prior to the filing date, § 102(b).[14] The anticipation doctrine ensures that no patents are issued the effects of which "are to remove existent knowledge from the public domain or to restrict free access to materials already available." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* — U.S. —, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (quoting *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). Anticipation requires disclosure of each of the elements of the claimed invention or their equivalents in a *single prior art* reference. *W.L. Gore & Associates v. Garlock, Inc.,* 721 F.2d 1540, 1554 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83

**13.** In addition, it was not until March 26, 1971 that Spalding received the results of the durability tests of the zinc/sodium Surlyn blend cover stock which demonstrated the ability of the blended cover to withstand severe cold-cracking tests without failure even when subjected to severe aging conditions. (JTX 435 at p. 2). Certainly Spalding would not have put blended Surlyn covered golf balls on the market unless the aging tests indicated that the cover stock would not rapidly decay on aging.

Acushnet also contends that on February 6, 1971, Astronaut Alan Shepard hit a golf ball which anticipated the claims of the Molitor patent, constituting a "public use" within the meaning of 35 U.S.C. § 102(b). This argument fails for several reasons. First, there is not clear and convincing evidence that the golf ball Astronaut Shepard hit on the moon was a Spalding golf ball. (Friese T.T., Vol. X, p. 106, ln. 2–15; Molitor T.T., Vol. VI, p. 11–12). Second, even if the ball hit on the moon was a Spalding ball it was not a blended zinc/sodium Surlyn ball because

as of February 6, 1971, Spalding had not begun full-scale production of the blended cover ball. (JTX 338, 346). Finally, the moon ball was not marketed as a replica of the balls hit on the moon but was marketed to commemorate the use of the first golf ball on the moon. (See JTX 121). Therefore, I find that the ball hit on the moon on February 6, 1971 did not fall within the Molitor patent. The mere profit from commercialization of an event that occurred prior to the statutory bar date does not constitute prior sale if the event did not involve the claimed invention.

**14.** As a practical matter, because the alleged invention date was thirteen and one-half (13½) months before the application filing date, very little difference exists between a § 102(b) printed-publication-more-than-one-year-before-the-filing-date bar, and a § 102(a) printed-publication-more-than-one-year-before-the-invention bar.

L.Ed.2d 107 (1984) (emphasis added). It is of no consequence to the analysis of anticipation that those who caused the invention to be published before the bar date did not appreciate newly discovered properties inherent in existing prior art. *Titanium Metals Corp. of America v. Banner*, 778 F.2d 775, 777 (Fed.Cir.1985).

The Harrison patent [15] teaches a golf ball cover composition (Composition H [16]) produced by mixing under *specified* conditions eighty-two (82) parts by weight of a copolymer, five parts by weight of a zinc oxide (ZnO) and thirteen (13) parts by weight of a titanium dioxide ($TiO_2$). (JTX 26, Col. 4, ln. 54–65). According to the defendant, Harrison's patent reported that zinc oxide was an active filler that served as a cross-linking agent when combined with ethylene/monocarboxylic acid ionic copolymer under the conditions used to make a golf ball cover. (JTX 26, Col. 1, ln. 52–61; Col. 2, ln. 9–14, 32–34, 49–54). Acushnet argues that the process of making the golf ball cover taught in Harrison will cause the metal ions to move throughout the ionic copolymer when it is mixed and heated, so

**15.** The Harrison specifications read, in part, as follows:

Example II

Two compositions, G and H, were prepared by mixing the following ingredients in an internal mixer at a temperature of 120°C to 150°C:

| Ingredients | Parts by wt. | |
|---|---|---|
| | G | H |
| CP | 82 | 82 |
| ZO | | 5 |
| TO | 18 | 13 |

Composition H was subsequently heated in the internal mixer for a further 15 minutes at 150°C.

The copolymer was a random copolymer of ethylene and acrylic acid having a melt flow index measured according to ASTM D–1238–62T of 1.7 grammes per 10 minutes at 190°C and contained 9 percent by weight of acrylic acid of which half was in the form of the sodium salt.

Small test slabs each having a size of 3 inches × 1 inch × 0.125 inch were moulded at 100°C, from Compositions G and H. The properties of each composition are shown in Table II:

TABLE II

| | G | H |
|---|---|---|
| CR | 435 | 450 |
| HA | 84 | 90 |
| VI | 69.2 | 70 |

It will be seen that the compositions had an increased cutting resistance when compared to Compositions A, B, E and F of Example I and a lower Vicat softening point when compared to Compositions A and B.

Golf balls were manufactured from Compositions G and H by moulding half-shells on to standard thread-wound cores. Satisfactory, playable golf balls resulted from the use of Compositions G and H and these were substantially better than those having covers formed from Composition E with regard to cutting resistance, with golf balls having covers formed from Composition H being slightly better than golf balls having covers formed from Composition G. (JTX 26).

**16.** The Harrison claims read as follows:

Having now described our invention—what we claim is:

1. A golf ball comprising a core and a cover, said cover being formed of a composition comprising a copolymer of ethylene and at least one unsaturated monocarboxylic acid containing from three to eight carbon atoms, said copolymer containing up to thirty percent by weight of said acid.

2. A golf ball according to claim 1, in which said monocarboxylic acid is selected from the group consisting of acrylic acid and methacrylic acid.

3. A golf ball according to claim 1, in which said copolymer is a terpolymer of ethylene, said unsaturated monocarboxylic acid and a metal salt of an unsaturated monocarboxylic acid, said metal being present in an amount of from 10 to 75 percent of the stoichiometric equivalent of said monocarboxylic acid.

4. A golf ball according to claim 3, in which said metal has a valency of 1 to 4.

5. A golf ball according to claim 1, in which said composition contains a cross-linking agent selected from the group consisting of acetates, carbonates, hydroxides and oxides of monovalent metals, said cross-linking agent being present in an amount of from 15 percent to 60 percent of the stoichiometric equivalent of the carboxylic acid in the copolymer.

6. A golf ball according to claim 1, in which said composition contains a cross-linking agent selected from the group consisting of acetates, carbonates, hydroxides and oxides of divalent metals, said cross-linking agent being present in an amount of from 15 percent to 60 percent of the stoichiometric equivalent of the carboxylic acid in the copolymer.

7. A golf ball according to claim 1, in which said composition contains from 10 to 20 percent by weight of titanium dioxide as filler.

8. A golf ball according to claim 6, in which said cross-linking agent is selected from the group consisting of zinc oxide and magnesium oxide. (JTX 26).

that when an ionic copolymer containing one type of metal ion is heated and mixed with another type of metal ion, both will move throughout the copolymer and react with the acid groups as cross-linking agents.

Anticipation by a printed publication occurs when the elements of the claimed invention are contained within the four corners of a single prior art reference. *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988). Nothing more (such as experimentation) is required, because the published reference is deemed by law to have placed whatever it contains within the public domain. It is also unnecessary that the prior art inventor have made the anticipating matter. It is enough that the prior art publication was enabling and placed the disclosed matter in possession of the public. *Akzo N.V. v. U.S. Intern. Trade Com'n,* 808 F.2d 1471, 1479 (Fed.Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987).

The plaintiff contends that U.S. Patent No. 3,264,272 ("Rees") (JTX 89), which was the pioneer patent on making ionic copolymers of olefin and an unsaturated carboxylic acid, teaches that metal oxides, such as zinc oxide, are not suitable for making the Surlyn ionic copolymers:

> Metal compounds ... are generally not suitable in resulting in ionic crosslinks in particular metal oxides because of their lack of solubility and the fact that such compounds form intractable compositions ...

(JTX 89, Col. 6, ln. 65–68).

According to Rees, a reactive metal acetate can be made from the metal oxide in the reaction mixture by adding "a metal oxide to the base copolymer [and] then add[ing] an acid such as an acetic ..." (JTX 89, Col. 7, ln. 10–16). Rees teaches that dissolution, and thus ionomer formation, occurs *only* after the addition of acetic acid. (JTX 89, Col. 8, ln. 48–50).

Therefore the Court, as trier of fact, must determine whether the defendants have proved by clear and convincing evidence that the zinc oxide in Composition H does react to form ionic crosslinks in the Composition H golf ball covers to form a golf ball cover of a blended zinc/sodium neutralized ionic copolymer. Acushnet contends that half the zinc oxide filler used in Composition H dissolves, even in the absence of *acetic acid,* via the remaining acid groups inherently present on the 50 percent sodium neutralized copolymer of ethylene and acrylic acid, further neutralizing the copolymer and producing a compound falling within the claims of the Molitor patent.

It is unnecessary, as a matter of law, for Acushnet to have made Composition H in order to prove prior publication under § 102(a). As a practical matter, however, it would be difficult to prove by clear and convincing evidence that zinc oxide would react with ethylene and methacrylic acid, without adding acetic acid, as taught by Rees, unless it were shown that Composition H golf balls had been made.

Acushnet attempted to prepare Composition H on two separate occasions. Acushnet failed in both of its attempts, once in preparation of the preliminary injunction hearing and again in preparation of trial. At the preliminary injunction hearing the Master rejected Acushnet's representation of Composition H because Acushnet had deviated from the teachings and procedures of Harrison. Acushnet again attempted to make Composition H on January 18, 1988 in preparation of trial. (PTX 74).

When Acushnet attempted to prepare Composition H on January 18, 1988 (PX 74), it failed to follow the exact teaching of Harrison (JTX 26). Acushnet had rejected a suggestion that the experiment be conducted with Spalding observers present (Berard T.T., Vol. XVII, p. 80, ln. 13). Acushnet not only deviated from the chemical and physical characteristics of the copolymer described in Harrison, but Acushnet deviated from the heating conditions described by Harrison for the preparation of Composition H. In particular, whereas the copolymer of Composition H contained 9 percent by weight acrylic acid, half of

which was in the form of the sodium salt (JTX 26, Col. 4, ln. 71–73), Acushnet's copolymer [17] contained 9 percent acrylic acid, only 48 percent of which was in the form of sodium salt. (Cooper T.T., Vol. XVIII, p. 78). Further, whereas Harrison specified a melt flow index of "1.7 grammes per 10 minutes at 190°C" (JTX 26, Col. 4, ln. 70–71), Acushnet employed a melt flow index of 1.76 (PX 74) [18] after having rejected in September or October of 1987 the same copolymer backbone with the closer melt flow index of 1.65 (PX 106, p. 10; Berard T.T., vol. XVI, p. 100–101). On the issue of the melt flow of the copolymer that Acushnet used to produce Composition H, Berard was asked the following questions and gave the following answers:

Q. And you were only point 05 away back in September, is that correct? Yes or no?

A. Yes.

Q. So your melt flow index is farther away on January 18th than you were back in September, correct?

A. Yes.

Q. Now, what did he do with that 1.76 melt flow index blend of copolymers?

A. He prepared Composition H.

Q. All right. Now, yesterday I believe you said that the melt flow index tells you the molecular weight of a polymer, a copolymer, is that right?

A. That is correct.

Q. So if you vary the melt flow index, you vary the molecular weight, do you not? Yes or no?

A. Yes.

(Berard T.T., Vol. XVII, p. 32, ln. 1–18).

Accordingly, not only did the copolymer used by Acushnet in its attempt to make Composition H vary in percent neutralization from the copolymer of Harrison, but it also varied in its molecular weight.

In addition to using a copolymer that varied from the teaching of Harrison in percent neutralization and melt index, Acushnet also failed to follow the heating steps recited by Harrison. In particular, the procedure for making Composition H includes two distinct heating steps. The first heating specifies a range requiring that the reactants ZO and TO be mixed in an internal mixer "at a temperature of 120°C to 150°C." (JTX 26, Col. 3, ln. 61). The second heating step uses the word "at" to specify a specific temperature, requiring that the mixture be heated "for a further 15 minutes at 150°C." (JTX 26, Col. 3, ln. 73). Because Harrison specified a range in the first heating step, it is clear that Harrison knew how to specify a range for the second heating step had he wanted to do so. By not specifying a range and by instead carefully selecting the word "at" for the second heating step, Harrison clearly indicated that he intended the second heating to be *at* 150°C.

Notwithstanding the express language in Harrison's heating steps for Composition H, Acushnet's heatings deviated significantly during its second attempt to reproduce Composition H. In particular, whereas the first step of Harrison specifies a range of 120°C to 150°C, Acushnet's ingredients were "mixed" at 320°F, i.e., 161°C per PX 99. (PX 75; Berard T.T., Vol. XVII, p. 40, ln. 8–17). This is more than 11°C over the temperature range expressly specified by Harrison.

Whereas Harrison's second heating step specifies "at 150°C," Acushnet's second heating step began at the 161°C and continued upward. (PX 75; PX 99; Berard T.T., Vol. XVII, p. 40, ln. 15–17). According to Berard's interpretation of PX 75, Acushnet's second heating step went to 410°F (205°C) at "the highest" (Berard T.T., Vol. XVII, p. 42, ln. 5–6); averaging out to 390°F (198°C) for 10–11 minutes (Berard T.T., Vol. XVII, p. 42, ln. 24 to p. 43, ln. 22) and 380°F (195°C) for the balance of the 15

17. Acushnet's copolymer was a commercial copolymer known as Dow 3460 acrylic.

18. PX 74 is the laboratory notebook pages of January 18, 1988 containing the handwritten

melt flow index of 1.76, and bearing the signatures of both Gertridge and Berard. Only at trial did Berard remember some other melt flow index more closely following Harrison.

minutes (Berard T.T., Vol. XVII, p. 43, ln. 2–19).

Therefore, based upon Berard's own interpretation of Acushnet's temperature profile, Acushnet exceeded the specific 150°C temperature of Harrison's second heating step by 48°C for 10–11 minutes and by 45°C for the balance of the 15 minute heating step.

Based upon Berard's testimony, Doctor Risen, Spalding's trial expert, concludes that the temperature profile reported by Acushnet for the second heating step of Composition H is:

> significantly different from and would lead to a different composition of matter than what is described by Harrison in this description of Composition H.

(Risen T.T., Vol. XX, p. 19, ln. 16–19; PX 123). Acushnet, however, contends that there is a heat of mixing that occurs and that Harrison does not really mean "at 150°C." Regarding the meaning of "at 150°C," Risen refers to Col. 3, lines 7–9 of Harrison, stating:

> The sentence actually starts in line 7, "The crosslinking agent is usually mixed at about 150 degrees and allowed to react with the copolymer at this temperature for about 15 minutes." And that doesn't have anything to do with the mixing machinery as far as I can tell, and it says pretty clearly for 15 minutes at 150 degrees.

(Risen T.T., Vol. XX, p. 25, ln. 22 to p. 26, ln. 4). As to whether Acushnet could have controlled the temperature Risen states:

> ... the control of temperatures around 150 degrees is a well advanced art.

(Risen T.T., Vol. XX, p. 25, ln. 5–7). To control the temperature in the second heating step, Acushnet could have started mixing at 120°C and still have been within the range specified by Harrison (Risen T.T., vol. XX, p. 26, ln. 9–15): "blend at a lower—slower rate ... and you can cool it." (Risen T.T., Vol. XX, p. 27, ln. 1–8).

Acushnet did none of these things. Moreover the internal mixer used by Acushnet had a "water jacket" surrounding it the function of which included "cooling." As a result of the temperatures utilized by Acushnet during its second attempt to prepare Composition H, Risen concluded that Acushnet prepared a composition that was very different from the Composition H of Harrison. (Risen T.T., Vol. XX, p. 18, ln. 12 to p. 19, ln. 19). I find, therefore, that Acushnet did not follow the procedures of Harrison.

This does not resolve the issue however. I must still determine whether, despite Acushnet's failure to make Composition H, one of ordinary skill in the art of golf ball technology would have produced a golf ball within Claims 1–4 of the Molitor patent by following the Harrison patent.

I find that what Harrison teaches in Composition H is a zinc oxide filled ionomer having crosslinking properties. I find that Harrison does not teach the formation of a blended zinc/sodium ionic copolymer from zinc oxide crystals because *only* the addition of acetic acid permits the dissolution of the zinc oxide crystals to zinc ions, allowing the zinc ions to exchange for hydrogen ions on the copolymer thereby forming the zinc/sodium ionic copolymer. I find that the zinc oxide crystals do not dissolve solely from the acid groups in the copolymer. Prior to the addition of acetic acid, the copolymer merely attaches to the surface of the relatively large zinc oxide crystals [19] as the active filler taught by Harrison. Therefore, I rule that the Harrison patent does not anticipate the patent-in-suit.

## B. OBVIOUSNESS

 Whether a patent is obvious under 35 U.S.C. § 103 is a question of law which is based on factual findings. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966). A party asserting invalidity for obviousness has the burden of proving his assertion by clear and convincing evidence. *Railroad Dynamics v. A. Stucki Co.*, 727 F.2d 1506, 1511 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984).

---

19. The zinc oxide (ZnO) crystal is 47,000 billion times as large as the zinc ion. (Kinsey T.T., Vol. XIII, p. 86, ln. 11–14); Risen T.T., Vol. XX, p. 71, ln. 1–8).

Section 103 instructs that an invention otherwise patentable will not be entitled to a patent "if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103.

In making its factual findings regarding obviousness, a court must consider the following factors:

(1) the scope and content of the prior art;

(2) the difference between prior art and the claimed invention;

(3) the level of ordinary skill in the art;

(4) objective evidence of non-obviousness otherwise referred to as "secondary considerations."

*Graham,* 383 U.S. at 17–18, 86 S.Ct. at 693–694. Such secondary considerations, which were first stated in *Graham,* include evidence of (a) commercial success due to the invention; (b) long-felt but unsolved needs for a given invention; (c) failure of others to create the claimed invention; and (d) copying of the invention in preference to prior art. The trier of fact must consider such secondary considerations of obviousness before a conclusion of law is reached. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d at 1380.

The *Graham* inquiry requires the trier of fact to focus on the facts and circumstances existing at the time the invention was made, not at any later time. The factfinder must then determine whether the patent challenger has established by clear and convincing evidence that the claimed invention as a whole would have been obvious from the perspective of a person of ordinary skill [20] in the art at the time the invention was made. *See Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1569 (Fed.Cir.), *cert. denied,* 481 U.S. 1052,

107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The Court may not rely on hindsight or use the patent as a guide in evaluating prior art. *Rolls–Royce Ltd. v. GTE Valeron Corp.,* 625 F.Supp. 343, 348 (E.D.Mich.1985), *aff'd,* 800 F.2d 1101, 1109 (Fed.Cir.1986).

Thus the critical inquiry is not whether it would have been obvious to try a particular method or process leading to an invention (blending ionic copolymers to make a golf ball cover), but rather whether such an experiment would have been expected to succeed (specifically, achieve an increase in coefficient of restitution from blending ionic copolymers to form a golf ball cover). *See In re Merck,* 800 F.2d 1091, 1097 (Fed. Cir.1986).

### 1. *Acushnet's Prima Facie Case*

Acushnet contends that prior art existing at the time of the Molitor invention made the claims of the patent-in-suit obvious to one of ordinary skill in the art of golf ball technology. Acushnet seeks to prove that the Harrison patent taught that golf ball covers could be comprised of zinc ionic copolymers, sodium ionic copolymers or a blended zinc/sodium ionic copolymer,[21] and that this teaching, in conjunction with the Rees patent (JTX 89), which teaches that the user of ionic copolymer with two kinds of metal ion rather than one achieves an improvement in properties, rendered the Molitor invention obvious. Moreover, Acushnet contends that, as of December 28, 1970, information generally known in the golf ball manufacturing industry rendered Molitor's claimed golf ball cover obvious. This information falls into three general categories: (a) knowledge concerning blending of Surlyns; (2) knowledge concerning the use of zinc to minimize cold-cracking; and (c) knowledge concerning the compatibility of zinc and sodium in Surlyn

---

**20.** An individual who has attained the level of ordinary skill in the art of golf ball technicians has a Bachelor of Science degree in chemistry or other technical area, or equivalent practical experience. Such individuals consult publications of professional conferences and chemical companies and work extensively in the field of golf ball design and manufacturing.

**21.** The Court disagrees with the contention that Harrison teaches a golf ball cover comprising a zinc/sodium ionic copolymer, *see infra.*

products.[22]

I find that a person of ordinary skill in the art of golf ball technology on December 28, 1970 would have blended zinc and sodium Surlyns together to try to solve a cold-cracking problem. I conclude as a matter of law that Acushnet has established a prima facie case of obviousness under § 103.

## 2. *Unexpected Properties*

 In order to sustain the validity of the Molitor patent, in the face of a prima facie showing of obviousness, Spalding contends that a combination of known ingredients (zinc and sodium Surlyn) having certain known properties (tensile strength, stiffness, hardness, melt flow), when blended together in certain critical proportions, would result in a golf ball cover having unexpected and desirable properties (increase in coefficient of restitution which corresponds to the distance the ball will travel, *see supra,* p. 1029 n. 3) not previously discussed or achieved in the prior art.

In order to be patentable, a compound need not excel over prior art compounds in all common properties;

> Evidence that a compound is unexpectedly superior in *one* of a spectrum of common properties, as here, can be enough to rebut a prima facie case of obviousness.

*In re Chupp,* 816 F.2d 643 (Fed.Cir.1987) (citing *In re Ackermann,* 444 F.2d 1172, 1176 (CCPA 1971)). In *Chupp,* the Federal Circuit reversed a Board of Appeals ruling which had affirmed the Patent Office's rejection based on obviousness, of Chupp's claims to a herbicidal compound. *Id.* at 647. In arriving at its holding, the Federal Circuit pointed out that "[f]rom the standpoint of patent law, a compound and all of its *properties* are inseparable; they are one and the same thing." *Id.* at 645–646 (citing *In re Papesch,* 315 F.2d 381 (CCPA 1963)) (emphasis added). The court explained that:

> Under the *Papesch* doctrine, evidence of unobvious or unexpected advantageous *properties* may rebut a prima facie case of obviousness based on structural similarities. [Citation omitted]. Such evidence may include *data* showing that a compound is unexpectedly superior in *a property* it shares with prior art compounds.

*In re Chupp,* 816 F.2d at 646. In *Chupp,* the Federal Circuit found that Chupp's data, submitted in the form of declarations to the Patent Office, showed that the claimed compound possessed superior herbicidal activity on quack-grass and yellow nutsedge in corn and soybeans over the activity of the closest prior art compounds. *Id.* at 645. The court then concluded that the claimed subject matter would not have been obvious to one of ordinary skill in the art at the time the invention was made. *Id.* at 647.

Similarly, in the present case, Molitor submitted data to the Patent Office, in affidavit form, (JTX 42A, p. 51–63), comparing a property, the coefficient of restitution of his claimed blend of sodium and zinc ionic copolymers, to that of the weighted average [23] of the individual sodium Surlyn and zinc Surlyn in the blend. Molitor's data showed that, in addition to solving the cold-cracking problem, his claimed blend produced coefficient of restitution greater than the weighted average [24] of the coeffi-

---

**22.** I find that it was obvious to one of ordinary skill in golf ball technology at the time of the *Molitor* invention to blend Surlyns and to use zinc Surlyn to solve cold-cracking problems. I leave unresolved the factual dispute as to knowledge of the compatibility of zinc and sodium in Surlyn products at the time of the Molitor invention and no part of this decision is influenced by this disputed fact.

**23.** The weighted average is an expected (calculated) value reflecting the sum of the proportional contributions from each individual component. In a 90/10 mixture of A and B, the expected COR based upon the weighted average would be nine-tenths the COR of a pure A plus one-tenth the COR of pure B. [Bailey T.T., Vol. XXIV, p. 20, ln. 12 to p. 22, ln. 13].

**24.** From a reading of pages 47 and 48 of the file wrapper and the graph set forth on pages 54 and 59, it appears that the Molitor claims related to the increase in the coefficient of restitution of the blend over the weighted average of the individual ionomers and not over the individual Surlyns as Acushnet argued. On Pages 47 and 48, the following excerpt appears:

cient of restitution of the individual sodium Surlyn and zinc Surlyn. Because the coefficient of restitution of the weighted average is the expected coefficient of restitution of the blend, Molitor's data shows that his claimed composition had an unexpectedly superior *property*, a superior coefficient of restitution, over what was otherwise predicted (by the weighted average).

The Court rules that just as the court in *Chupp* held that data of superiority in a single herbicidal activity over the herbicidal activity of the prior art compounds established its non-obviousness, so too does Molitor's unexpectedly superior coefficient of restitution for the claimed range of blends establish its non-obviousness. This has been confirmed both by the Patent Office's decision to issue the Molitor patent on the basis of his data, and by the holding in *Chupp*. Therefore, the Court finds that the blending of zinc Surlyns and sodium

Surlyns in a golf ball cover results in unexpected properties over the weighted average of the individual Surlyns.

### 3. Secondary Considerations of Non-Obviousness

█ Evidence of secondary considerations must be considered before arriving at a conclusion of obviousness. *Ashland Oil, Inc. v. Delta Resins & Refractories*, 776 F.2d 281 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986). For secondary considerations to preclude a finding of obviousness, the patentee must demonstrate a sufficient relationship between the allegedly infringed features of the claimed invention and its commercial success. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1539 (holding that secondary considerations may be the most prohibitive and cogent evidence of

However, relative to the zinc compound, it is respectfully submitted that the mixture of sodium and zinc produces a golf ball having a resulting higher coefficient of restitution. In this connection it should be pointed out that the coefficient of restitution of the balls in Example 1 (zinc and sodium copolymer mixture) is .778. In contrast the coefficient of restitution of the balls in Example 3 (singular zinc copolymer) is .764. The coefficient of restitution of the balls in Example 6 (zinc and sodium copolymer mixture) is .768 whereas the coefficient of restitution of the balls in Example 8 (singular zinc copolymer) is .755. From comparing these two sets of examples it can be clearly seen that the mixture of sodium and zinc copolymers produces a higher coefficient of restitution when compared to the use of the zinc copolymer singularly.... [R]elative to the significance of the difference between the mixture of sodium and zinc copolymers as is to be compared with the zinc copolymer singularly, the Examiner's attention is directed to the fact that the Applicant will submit in the near future a Rule 132 Affidavit to further emphasize these differences.

These tests clearly indicate that a 50/50 blend of sodium and zinc copolymers achieves a coefficient which is .013 to .014 points higher than that achieved by the zinc copolymer alone. A comparison of Example 6 with Example 2 in the patent specifications verifies that the 50/50 sodium zinc copolymer blend displays a reading (.768) which is .002 points less than the reading for all sodium copolymer (.770). The graphs clearly show that the blends are higher in coefficient over the weighted average of the individual ionomers and not of each ionomer alone.

The following excerpt from page 48 of the File Wrapper reflects that a .009 point increase in coefficient of restitution which constitutes the absolute optimum increase, was not considered necessary to constitute an unexpected result because the 3 to 5 yard increase in distance relates solely to a comparison between the 50/50 zinc sodium blend and the zinc blend alone and does not relate to a comparison of any other percentage of a zinc sodium blend over the weighted average of the individual ionomers:

The difference in the coefficient of restitution, approximately .013 to .014 points, results in an ability of the golfer to drive the golf ball, which utilizes a zinc and sodium mixture, approximately 3 to 5 yards farther than a golf ball which uses a zinc copolymer singularly. Generally, .003 to .004 points in coefficient of restitution equals one yard in maximum driving range. Changes on the order of 3 to 5 yards are extremely significant in today's high technology golf and in fact many tens of thousands of dollars have been spent in recent years on advertising contesting as to which commercial golf ball is, in fact, the "longest ball."

The fact that the .009 point increase in coefficient of restitution was not considered necessary to constitute an unexpected result appears to be verified by a comparison of Example 1 with Example 2 set forth in paragraphs 5 and 6 of the Molitor Patent. Example 1 shows that a 50/50 sodium/zinc Surlyn reflects a .778 coefficient of restitution, whereas Example 2 is pure sodium Surlyn reflecting a .770 coefficient of restitution—an increase of only .008.

non-obviousness). The principal secondary considerations which support findings of non-obviousness are: (1) commercial success; (2) long-felt but unsolved need; (3) failure of others; and (4) copying of the claimed invention.

### (a) Commercial Success

The claimed blended zinc/sodium Surlyn cover is a component of Spalding's commercially successful Top–Flite golf ball. Spalding must show that there is a legally sufficient relationship between the patented *cover* and the Top–Flite's commercial success to satisfy its burden of coming forward with evidence sufficient to constitute a *prima facie* nexus between commercial success and the claimed invention.

The most compelling evidence of commercial success presented by the patentee is the testimony and documentary evidence as to the advantage of the claimed invention. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1391, 7 U.S.P.Q.2d 1222, 1225 (Fed.Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988) (holding that advantages of claimed invention support inference that claimed invention itself is responsible for commercial success). The uncontradicted testimony is that golf balls having the blended zinc/sodium Surlyn cover have the advantage of not cold-cracking (JTX 444), and possess a higher coefficient of restitution than the weighted average of the individual components.

. The record is also replete with documentary evidence establishing a relationship between the commercial success of the Top–Flite golf ball and the patented cover, as well as admissions by Acushnet to the same effect. Acushnet's own documents, praising the claimed "cover" on the Top–Flite ball, are admissions of a nexus between the claimed invention and the commercially successful Top–Flite golf balls. In an intracompany memo dated October 24, 1975, Acushnet admitted that Top–Flite's claimed blended Surlyn cover had the best cut resistance (durability):

*The Top–Flite has the best cut resistance of all the Surlyn balls. While the* Titleist DT could be improved, *it would be difficult to match the durability of the Top–Flite* and still retain the desirable features of a wound ball construction.

(JTX 362, second to last page; emphasis added).

In a letter dated August 17, 1978 from Acushnet's outside patent counsel, David Just, to Dr. John Jepson, a Vice President of Acushnet, Mr. Just repeats Dr. Jepson's observation that the claimed cover of the Top–Flite gives it more "initial velocity" than Acushnet's cover:

In our telephone conversation you advised that Spalding is apparently getting up to five more yards of initial velocity by use of a zinc/sodium blend of Surlyn resins for the cover whereas our cover which is composed solely of sodium resins shows no improvement in initial velocity.

(JTX 350, p. 2, ln. 1–5).

The Top–Flite golf ball has been one of the most commercially successful golf balls in history. The commercial success of the Top–Flite is disclosed in the testimony of both Spalding's and Acushnet's witnesses and supporting documentary evidence. Based upon the M. Turtur (attitudes and usage) study conducted for Spalding, Thomas Mayer, director of marketing for Spalding, testified that Spalding had only a 5 percent market share of the golf balls purchased by consumers when the invention was introduced. (Mayer T.T., Vol. 1, p. 169, ln. 20 to p. 171, ln. 3; PX 18). By 1981, Spalding's share of this market had climbed to percentages in the mid–30s. (Mayer T.T., Vol. I, p. 171, ln. 2–3; PX 18). Spalding's shipment, after introduction of its blended zinc and sodium Surlyn covered Top–Flite, rose from 4.7 million dozen in 1978, when data was first compiled, to 9.1 million dozen in 1987. (PX 6).

Acushnet's witness, Walter Uihlein ("Uihlein"), President and Chief Executive Officer of the Titleist Golf Division of Acushnet, testified that, for 1970, he places Spalding's percentage at 12–15 percent compared to Acushnet's 30 percent. (Uihlein T.T., Vol. XIX, p. 90, ln. 20 to p. 91, ln.

7). For 1980, Mr. Uihlein remembers Spalding's total industry shipments to be about 36 percent whereas Acushnet's dropped to 28 percent. (Uihlein T.T., vol. XIX, p. 91, ln. 8–12). Uihlein then admitted that Top–Flite was "a major contributor to their growth '70 to '80." (Uihlein T.T., vol. XIX, p. 91, ln. 13–16). Uihlein admitted that Spalding's success was driven by the Top–Flite:

> Q. The conclusion here, could you draw it that Spalding had more than doubled its share of the market on-course and off-course, whatever, however you go to it, and Acushnet was losing market, right?
>
> A. Yes. They were very much driven by the Top–Flite and the fact that by 1980, and Mr. Mayer would know better, but I believe all Spalding sales were surlyn-covered, by 1980 we were still 50 percent surlyn and 50 percent balata-covered.

(Uihlein T.T., Vol. XIX, p. 92, ln. 9–17).

The Top–Flite golf ball's commercial success is attributable to its two-piece construction as well as its blended zinc/sodium Surlyn cover. A commercially successful golf ball, however, must be comprised of a quality core and a quality cover and a construction which utilizes the benefits of all the component parts of the golf ball. Two-piece golf balls do not have elastic winding around their cores and therefore the distance the golf ball will travel is determined exclusively by the core and cover and not by how tightly the rubber thread is wound around the core. The Top–Flite patented cover provided an increase in the distance the ball would travel and the addition of zinc Surlyn solved the cold-cracking problem. I therefore find that the patented cover, in conjunction with the Top Flite's two-piece golf ball construction, was responsible for Top Flite's commercial success during the relevant time period.

#### (b) Long–Felt Need/Copying

Spalding was not the first golf ball manufacturer to encounter a cold-cracking problem. Ram had a cold-cracking problem in 1966–67 and had to destroy more than 5,000 dozen sodium Surlyn covered golf balls. According to Ram's President, Mr. Hansberger, the golf ball industry was looking for an alternative cover which would not crack during low temperature playing, but which would also produce a top-grade ball. (Hansberger T.T., Vol. XIV, p. 24–25). Although the Patent Examiner turned down the Molitor invention because he found that the use of zinc to solve cold-cracking problems was obvious, the uniqueness of the claimed invention is that it eliminated cold-cracking at the same time that it provided the additional benefit of an increase in coefficient of restitution.

Most telling, however, is that Acushnet turned to the blend of sodium and zinc Surlyns in the claimed proportions only *after* the Molitor invention. As the Supreme Court observed in *Diamond Rubber Company of New York v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527 (1911), the infringer "gives the tribute of its praise to the prior art; it gives the [Molitor invention] the tribute of its imitation ..." *Id.* at 441, 31 S.Ct. at 450.

Therefore, based on the application of the facts of the case at bar to the *Graham* factors, the Court rules that the Molitor invention and the prior art are such that the subject matter of the patent in suit was non-obvious on December 28, 1970 to a person of ordinary skill in golf ball technology.

### C. BEST MODE

Acushnet contends that the Molitor patent is invalid based on the assertion that the Molitor Patent Application failed to satisfy the requirement of 35 U.S.C. § 112 which states "the specification ... shall set forth the best mode contemplated by the inventor of carrying out his invention." Specifically, Acushnet alleges that the Molitor patent (1) failed to set forth the core material which was used in the Spalding two-piece Top Flite ball upon which ball the cover material of blended ionic copolymers gave the greatest advantage; and (2) failed to disclose the processing conditions re-

quired to produce the best exemplar of Spalding's two-piece golf ball.

### 1. *The Solid Core*

▮ The Molitor invention is an improved cover for golf balls. The invention is not the golf ball but "[a] golf ball comprising a core and a cover." (JTX 444, Col. 7, ln. 40). The law is not so foolish as to require that a patent for an improvement in a single part of a product include instructions on how to make the product when prior art teaches how to make the product. *See, e.g., Christianson v. Colt Industries, Inc.*, 822 F.2d 1544, 1563 (Fed.Cir.1987), *vacated,* —— U.S. ——, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), *rem'd,* 870 F.2d 1292 (7th Cir.1989). The law requires that the inventor disclose the best mode for making the *claimed* part of the invention, not every other part of the product to which the claimed part is attached. The specification of the Molitor patent points out in 22 places that the cover is the invention, beginning with the title "Golf Ball Cover Composition Comprising A Mixture Of Ionomer Resins." Prior art claims read on golf balls and two piece golf balls. Nowhere in the claims of the Molitor patent is it stated that the Molitor invention purports to be a two-piece golf ball.

### 2. *Special Molding Conditions*

As noted, the two-piece construction is no part of the Molitor invention. The invention is a cover composition comprising a blend of two ionic copolymers in the claimed proportions. "[T]he 'best mode' is that of practicing the *claimed* invention." *Christianson,* 822 F.2d at 1563 (emphasis in original). Spalding need not disclose the best mode of processing the best exemplar of the two-piece golf ball. The best mode of practicing the claimed invention is the 50/50 blend of zinc Surlyn 1557 and sodium Surlyn 1555. This embodiment was disclosed.

### D. LACHES AND EQUITABLE ESTOPPEL

▮ The only statutory limitation on commencing a patent infringement action is found in 35 U.S.C. § 286, which provides that a patentee cannot recover damages for any infringement committed more than six years before the filing of the complaint. This limitation bars recovery for damages before the lawsuit was filed; it does not bar the infringement suit altogether. Courts, however, since *Leggett v. Standard Oil Co.*, 149 U.S. 287, 294, 13 S.Ct. 902, 904, 37 L.Ed. 737 (1893), have applied the equitable doctrine of laches to bar stale infringement claims. The Federal Circuit has followed precedent applying the doctrine of laches to bar claims where there has been unreasonable and unexcusable delay in the assertion. *Hottel Corp. v. Seaman, Corp.*, 833 F.2d 1570, 1572–73 (Fed. Cir.1987); *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734 (Fed.Cir.1984).

In *Leinoff,* the Federal Circuit applied the equitable doctrine of laches to patent infringement cases as follows:

> The one asserting a laches defense normally must prove the unreasonableness of a delay in filing the suit. The unreasonableness of a delay, of course, depends on the particular circumstances of the case and is left as a matter of the trial court's discretion. Normal equity practice, however, considers the passage of time equivalent to a comparable statute of limitations presumptive of laches. Because of the 6–year statute of limitations in section 286, therefore a 6–year delay is presumptively an unreasonable one for filing a patent infringement suit.

*Id.* at 741–42 (citations omitted).

The factual dispute to be resolved on this issue is the length of Spalding's delay in bringing this action. If the delay in filing suit was greater than six years, Spalding must prove that Acushnet was not prejudiced by the delay. If the delay was less than six years, there is a presumption against the application of laches.

I find the following facts upon the evidence presented. Spalding first knew that Acushnet was making golf balls with zinc and sodium in the cover no later than February, 1974. (JTX 41; 157). The Molitor patent issued on June 25, 1974. On April 13, 1976, Spalding's Chairman of the Board sent a letter to the Chairman of the Board

at Acushnet complaining that certain statements in an Acushnet golf ball advertisement, comparing the covers of Acushnet's DT Titleist and Spalding's Top Flite, were false and deceptive. (JTX 219). Mr. Paul Putnam ("Putnam"), Spalding's Board Chairman, complained that:

> [your statement that] our DT Titleist uses the same tough cover as the Top Flite is absolutely false, unless your DT Titleist is an infringement upon Spalding's U.S. Patent No. 3,819,768!

(JTX 219). In a reply dated April 23, 1976, Acushnet's President, William Bommer ("Bommer"), advised Mr. Putnam:

> Regarding your point [about the same tough cover].... This statement was intended to point out to the golf consumer that both Acushnet's DT Titleist and Spalding's Top–Flite have tough Surlyn covers as differentiated from balata covers. This statement is true. We certainly did not want to imply that both Surlyn covers were identical. While I am sure that the large majority of golfers would interpret the statement as it was intended, I can appreciate that the word, Same, chosen by the agency as part of the statement might cause some confusion and, possibly, an interpretation such as you brought to our attention. Therefore, I have instructed our agency to reword the statement in question so as to clear up any possible misinterpretation.

(JTX 356).

In reaction to Spalding's letter, Acushnet began experimentation to change to a non-infringing all sodium blended cover. (JTX 398; 374, p. 2; 396, p. 3). By October of 1977, Acushnet had stopped infringing. Spalding could have sued Acushnet for the infringement between June 25, 1974 and October of 1977. Spalding's business judgment, however, was not to litigate the issue.[25] There was no infringement between late 1977 and late 1980.

In late 1980, Acushnet introduced its Pinnacle ball. (JTX 153; 154). The Pinnacle ball, which used a different cover composition of zinc and sodium than Acushnet had used prior to 1977, nevertheless was viewed by Spalding as infringing the Molitor patent. Within a few months of the introduction of the Pinnacle ball, Spalding filed this infringement action.

There have been two separate periods of infringement involving two separate infringing golf balls.[26] Spalding gave Acushnet notice of Acushnet's infringement in 1976, about two years after Spalding learned that Acushnet was using a zinc and sodium covered golf ball. Spalding chose not to sue Acushnet when it promptly stopped infringing. When Acushnet once again infringed the Molitor patent, albeit with a new cover composition,[27] Spalding filed suit within months. Spalding did not delay six years in filing this action and I follow the presumption enunciated in *Leinoff* and rule that Spalding's claim is not barred by laches.[28]

---

**25.** Courts faced with crowded dockets and a litigious business community should not punish a corporation for choosing not to litigate when the damage-causing conduct has ceased.

**26.** Where the infringer alters the nature of its infringing activity, a new period of delay begins as to the altered conduct. *MGA, Inc. v. Centri–Spray Corp.*, 639 F.Supp. 1238, 1244 (E.D.Mich. 1986); *see also Celotex Corp. v. Jacuzzi Whirlpool Bath, Inc.*, 211 U.S.P.Q. 232, 233 (N.D.Ill. 1980); *Nordson Corp. v. Graco, Inc.*, 187 U.S.P.Q. 119, 120 (N.D.Ohio 1975); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n*, 630 F.2d 1155, 1164 (6th Cir.1980); *Keiser v. J. Wiss & Sons Co.*, 340 F.Supp. 41, 55, 173 U.S.P.Q. 594, 605 (D.N.J.1972).

**27.** This new cover composition, the Pinnacle, is the subject of Acushnet's own U.S. Patent No.

4,323,247. (JTX 355). To obtain this patent, Acushnet had to demonstrate to the PTO that the Pinnacle cover was novel and patentably distinguishable over the prior art, including Acushnet's own pre–1977 DT Titleist sodium/zinc blended covered balls.

**28.** Acushnet also argues that the doctrine of equitable estoppel bars any claim based on the patent. Equitable estoppel applies against a plaintiff in a patent action when there is:
(1) an unreasonable and inexcusable delay in filing the law suit;
(2) prejudice to the defendant as a result of the delay;
(3) affirmative conduct by the patentee inducing the belief that it had abandoned its claims against the alleged infringer; and
(4) detrimental reliance by the infringer. *Hottel Corp.*, 833 F.2d at 1573. Since I have ruled

## E. INEQUITABLE CONDUCT

 Inequitable conduct by a patentee in procuring a patent from the Patent Office renders a patent unenforceable and provides a defense against charges of infringement. *Kingsdown Medical Consultants Ltd. v. Hollister, Inc.*, 863 F.2d 867, 874 (Fed.Cir.1988); *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1560–61 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). The defense of inequitable conduct requires proof by clear and convincing evidence of the patent applicant's failure to disclose material information with an intent to deceive. *Kingsdown*, 863 F.2d at 872.

 Inequitable conduct may include affirmative acts of commission, such as the submission of false information, and it may also include acts of omission, such as the failure to disclose material information.[29] Acushnet contends that Spalding's failure to disclose an opinion of its consultant, Dr. Paul Bruins ("Bruins"), to the Patent Examiner constituted inequitable conduct. Spalding hired Dr. Bruins to evaluate the Examiner's first rejection of Spalding's patent application. Dr. Bruins prepared a written reply memo (JTX 125) of which both Molitor and Bahr were aware. Dr. Bruins stated that Example 2 of the Dunlop patent (Harrison) is:

> close to [the Molitor] composition. It shows in Comp H that half of the ionomer was in [sodium] form [and] the addition of [zinc oxide] would react with the remaining [acid] to convert to [zinc] form. However [Composition] H was only slightly better than [Composition] G in cut resistance and G had no [zinc oxide]. Your discovery relates to cold crack resistance, superior coefficient of restitution, durability and resistance to

aging. None of this is shown by Harrison.
(JTX 125).

Missing or false information need not be sufficient to invalidate a patent in order to be deemed "material." *Long Manufacturing N.C., Inc. v. Condec Corp.*, 223 U.S. P.Q. 1213, 1984 WL 1351 (E.D.N.C.1984). Therefore this Court's finding that the zinc oxide does not react sufficiently in Composition H to form a blended ionic copolymer is not dispositive of the inequitable conduct issue. Otherwise, the duty of candor to the Patent Office would impose no duty beyond the substantive requirements of patent validity.

The threshold level of materiality is codified at 37 C.F.R. 1.56(a): "information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." I find that the Bruins memo was material. A reasonable Examiner may have considered the Bruins memo as evidence that Composition H of Harrison taught a blended zinc/sodium ionic copolymer golf ball cover, and the memo is therefore relevant to the issue of anticipation.

Having found the Bruins memo material, I now turn to the element of intent. The level of intent required to support a finding of inequitable conduct depends upon the importance of the withheld information to a reasonable Examiner. "Upon balancing, if materiality is determined to be at the threshold, such that the withheld information would have been important to a reasonable Examiner but not crucial to his decision, a higher level of intent through a showing of acts which would indicate more than gross negligence (or recklessness) may be necessary for a finding of inequitable conduct." *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350,

---

that there has been no unreasonable and inexcusable delay, I need not reach the other elements of the equitable estoppel claim. I rule that Spalding is not equitably estopped from pursuing its claims.

29. Acushnet contends that Molitor and/or Spalding's attorney, Donald Bahr, misrepresented the import of the Harrison patent by charac-

terizing it as a "shotgun" disclosure in which the discussion of mixed ionic copolymers is broad and cursory. (JTX 42A at 40). Since I have found that the zinc oxide, as taught by Composition H, does not react to form a zinc/sodium ionic copolymer, I find that the patent applicant's statement was not a misstatement, and that neither Molitor nor Bahr intended it to be a misstatement.

1363 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

I find that Mr. Molitor did not realize that the Bruins memo was relevant to the issue of anticipation. Spalding, as the patent applicant, cited the Harrison patent to the Examiner as prior art. However, neither Roy Kinsey, Dupont's expert on Surlyns, nor Mr. Molitor, nor the Examiner himself realized that the Harrison patent *may* have taught a blended ionic copolymer golf ball cover, and may therefore have been anticipatory to the Molitor patent. Even the Bruins memo failed to opine that Composition H of Harrison anticipated the Molitor patent, but rather stated only that it was "close to," but not identical with, the Molitor invention. Mr. Molitor personally believed that the zinc oxide present in Composition H was being used as an active filler rather than to form a blended zinc/sodium ionic copolymer. Spalding had retained Dr. Bruins as a consultant *after* the patent-in-suit was rejected as being obvious, and the Bruins memo addressed the issue of obviousness and not the issue of anticipation. The Bruins memo stated that Composition H of Harrison was *"close to"* Molitor's invention, but that Molitor had discovered properties not shown by Harrison. Therefore, I find that even Dr. Bruins did not believe Composition H was anticipatory, but rather he confirmed Mr. Molitor's belief that his blended Surlyn cover displayed superior qualities and was for this reason non-obvious. In addition, I find that Mr. Molitor recognized that the Rees patent taught that the zinc oxide used in Harrison would not dissolve to form zinc ions in the absence of acetic acid. In short, at the time of the invention neither Mr. Molitor nor the golf ball or plastics industry as a whole considered Composition H anticipatory. Therefore, I find that because Mr. Molitor did not realize that the Bruins memo was relevant to anticipation; he did not intend to deceive the Examiner under any standard of intent.[30] The Court rules

that Acushnet has failed to prove by clear and convincing evidence that the patent applicant engaged in inequitable conduct before the Patent Office.

## III. INFRINGEMENT

■ Having ruled that Acushnet has not proved by clear and convincing evidence that Spalding's '768 patent is invalid or unenforceable, the Court turns to the issue of infringement.

The party asserting a patent right must prove infringement by a preponderance of the evidence. *Uniroyal, Inc. v. Rudkin Wiley Corp.,* 837 F.2d 1044, 1054 (Fed.Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). A patent is infringed if the accused device falls within the asserted claims of the patent in suit. *Kalman v. Kimberly–Clark Corp.,* 713 F.2d 760, 770 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984).

It is undisputed that Acushnet has infringed claims 2 and 3 of Spalding's '768 patent. Acushnet's trial counsel conceded infringement of the '768 patent by Acushnet, if Acushnet failed in its burden to prove the patent invalid.

THE COURT: But on your part, there's been a plethora of evidence that internal documents at Acushnet took it for granted that the blend of a zinc and sodium Surlyn by itself constituted a violation of the patent.

MR. HESTNES: No question about that, your Honor. Because they were concerned, the technical people had a patent before them. If you read the specifications, they are rather clear. If you blend Surlyns together, that is what the patent was about. Then they later got an opinion of counsel that the patent was invalid. There is no question but we blended Surlyn. There is no question but with respect to certain blends we

**30.** Since I have found that the patent applicant did not intend to deceive the Examiner, I need not determine how crucial the withheld information would have been to the Examiner. It is worth noting again, however, that I do not believe that the zinc oxide in Composition H

reacts sufficiently to form a zinc/sodium ionic copolymer. Even Dr. Bruins does not go this far. Therefore, although the Bruins memo is, as a matter of law, *material,* I do not believe it would have been *crucial* to the Examiner's decision.

saw an improvement of coefficient of restitution of the blend over either of the individual Surlyns. We were blending Surlyns throughout this period.

THE COURT: We're concerned with validity. The infringement issue, if the patent is valid, there's infringement.

MR. McANDREWS: There can't be any doubt about that, your Honor.

THE COURT: The question is validity.

MR. HESTNES: Absolutely, your Honor. That's the basic question in this case.

[T.T. Vol. XVII p. 140, ln. 1 to p. 141, ln. 2].

At the close of trial, Acushnet's trial counsel again conceded the issue of infringement:

MR. HESTNES: But they have to make out their prima facie case. I think they should go first, your Honor.

MR. McANDREWS: The prima facie case is a certified copy of the patent and an infringement [of the] patent if valid. I'll be happy to lead.

THE COURT: If you want—the point is: For all practical purposes, the issue is validity.

MR. McANDREWS: That's right.

MR. HESTNES: That's right, your Honor.

[T.T. Vol. XXV, p. 112, ln. 3–14].

The following documentary and testamentary evidence presented at trial establishes by a preponderance of the evidence, independent of Acushnet's trial counsel's concessions, that Acushnet infringed the Spalding patent by blending zinc Surlyn salts and sodium Surlyn salts to form a golf ball comprising a core and a cover which had all the elements recited in claim 2 and claim 3 of the Spalding patent. *See* T.T. Vol. X, p. 348; trial testimony of Doctor Cooper, T.T. Vol. XVII, p. 216, ln. 14–20 and T.T. Vol. XVIII, p. 21, ln. 12–19; trial testimony of Doctor Berard, T.T. Vol. XVII, p. 216, ln. 14–20 and T.T. Vol. XVIII, p. 21, ln. 12–19; PX 28 and trial testimony of Doctor Risen, T.T. Vol. VI, p. 114, ln. 8 to p. 115, ln. 1 and T.T. Vol. VI, p. 115, ln. 2 to p. 116, ln. 2; JTX 360; JTX 380; JTX 397; JTX 412.

## IV. CONCLUSION

For the reasons discussed above, the Court concludes that the defendant has failed to prove the patent-in-suit either invalid or unenforceable, and the plaintiffs have proven their claims of infringement.

SO ORDERED.